IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EUGENE ECHOLS,           )
                         )
        Plaintiff,       )
                         )
    vs.                  )    Case No. 07 C 2812
                         )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,      )
                         )
        Defendant.       )

# MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Eugene Echols appeals from the denial of his application for Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income benefits (SSI). For the reasons stated below, the Court remands the case to the Social Security Administration for further proceedings.

## Facts

On September 24, 1999, Echols applied for DIB and SSI. Echols contended that he became disabled on May 1, 1999 due to multiple injuries he sustained between 1988 and 1999. In 1988, Echols suffered a comminuted fracture of the left scapula with embedded shrapnel in the soft tissues of the neck and shoulder, as the result of a gunshot wound. In 1994, Echols was stabbed in his abdomen and shot in the hip, resulting in hip, femur, and pelvic fractures. During surgery to repair the fractures, pins were inserted into his right hip and femur. In 1995, Echols was assaulted and suffered a fracture to the olecranon of his left elbow, which was repaired with "k-wires." On April

13, 1999, Echols received treatment for a displaced and angulated fracture of the fifth finger on his left hand.  Echols says that the pain from these injures increased over time, such that by May 1999 he was permanently disabled.

Prior to May 1999, Echols worked as a school bus driver, security guard and janitor.  Echols was fired from his last job, as a bus driver, because his driver's license was suspended as a result of a DUI charge.  Echols has at least a ten year history of drug and alcohol abuse.  He admits to drinking up to two pints of wine a day and has also tested positive for cocaine use at least twice since 1999.

In October 1999, Echols began to complain of a sharp pain in his right hip that sometimes radiated down his right leg.  He was examined by an internist, Dr. Maung Win.  Echols told Dr. Win that the pain in his leg was aggravated by standing for an hour.  He also complained of a sharp pain in his left elbow which was aggravated by elbow movement.  According to the ALJ, Dr. Win was not able to ascertain the cause of Echols' hip pain but noted a reduced range of motion of the right hip.  Dr. Win also found a decreased range of motion of the left elbow but normal manual dexterity bilaterally.

On November 19, 1999, Dr. Stanley Burris, a physician with the state agency that assesses disability claims in Illinois, reviewed Echols' file and filled out a residual functional capacity assessment (RFC) checklist.  Dr. Burris concluded that Echols could occasionally carry fifty pounds and could frequently lift twenty-five pounds.  He found that Echols could stand/walk for about six hours in an eight-hour workday and could sit for about six hours in a day.  He also noted that Echols had no push/pull restrictions and that he could frequently climb stairs, but never ladders, ropes or scaffolds.  Finally,

Dr. Burris noted that Echols could frequently balance, stoop, kneel, crouch and crawl. Another state agency physician, Dr. Francis Vincent, reviewed Echols' file and affirmed Dr. Burris' conclusions.

On March 27, 2000, Echols underwent a podiatric consultation for pain in his feet. The resident physician, Dr. Hyman, noted that Echols was inconsistent in describing the type of pain he experienced and the location and duration of his symptoms. The resident also noted that although Echols had multiple calluses and his dorsal digits were contracted, he was grossly intact neurologically. Echols' calluses were debrided during that visit. A few days later, x-rays showed Echols had minimal degenerative joint disease and bilateral hammertoes.

On April 5, 2000, Echols was hospitalized and treated for a gastric ulcer. The attending physician noted that Echols' leg pain was likely a result of peripheral neuropathy due to alcoholism or a vitamin B12 deficiency. Echols was discharged on April 7 and was informed that he should reduce his alcohol consumption and stop taking NSAIDs, except for Vioxx.

Echols received most of his medical treatment through the Westside Veterans Administration medical facility (VA). He was treated by VA physician Laura Horvath, M.D. in the years 2000 and 2001. On his second visit, in August 2000, Dr. Horvath completed an RFC assessment for Echols. She reported that Echols complained of sharp, daily pain in his left elbow which worsened when he picked up objects. She also noted that he had a ten degree loss of extension in his left elbow, but there was no edema and his range of motion was good. Dr. Horvath also reported that Echols complained of pain in his right hip. Her assessment was that Echols could sit

3

continuously for one hour but for less than two hours in a workday. She found that Echols could stand continuously for fifteen minutes but could stand/walk less than two hours in a workday. Dr. Horvath also noted that every sixty minutes, Echols needed to be able to walk for at least two minutes. She stated that Echols would need to be able to change positions at will and take unscheduled breaks every two to three hours for approximately thirty minutes per break. She noted that Echols did not need a cane or other assistive device, nor did he need to elevate his legs. She also noted that he had no limitations on repetitive reaching, handling or fingering but ("inconsistently," according to the ALJ) could not use his left hand to grasp, turn, or twist objects. Dr. Horvath also stated that Echols could occasionally lift or carry less than ten pounds but could not lift or carry anything heavier than that and should never twist or bend at the waist. Finally, Dr. Horvath opined that Echols would be absent from work approximately twice a month due to his impairments.

On January 31, 2001, Echols saw Dr. Horvath again and complained of pain in his feet, left elbow, and right hip. Dr. Horvath ordered x-rays of Echols' left elbow, which showed a healed olecranon fracture (a fracture of the end of the ulna) and possible myositis ossificans (ossification of muscle tissue, which can cause pain and swelling).

On May 22, 2001, Dr. James Elmes performed an orthopedic consultative examination of Echols at the ALJ's request (between the initial hearing and a supplemental hearing). Echols told Dr. Elmes that he had right hip pain and stiffness that worsened with any lifting, bending, twisting, or direct pressure. He also reported that his right leg occasionally gave out. He reported pain in both feet, which he claimed

4

was exacerbated by bending and twisting his foot and ankle. Echols also claimed to have stiffness and pain in his left elbow that increased with lifting activities and bending and twisting of the elbow.

According to Dr. Elmes, x-rays of Echols' left elbow reflected that his injury there had healed satisfactorily. X-rays of Echols' right hip reflected some abnormal bone growths that Dr. Elmes believed likely impinged on Echols' right hip joint, reducing somewhat his range of motion. Dr. Elmes described Echols' gait as normal but noted that he slightly favored his right leg. He noted slightly reduced strength in Echols' left hand and right leg.

In his report, Dr. Elmes stated that Echols could lift, carry, push and pull twenty-five pounds frequently if using both arms but was limited to ten pounds if using only his left arm. He determined that Echols could stand/walk at least two hours in an eight-hour workday and could sit as long as he was able to alternate sitting and standing. Dr. Elmes also stated that Echols could climb ramps and stairs on occasion, but never ladders, ropes or scaffolds. He stated that Echols could balance, kneel and crouch occasionally, but never crawl. Finally, Dr. Elmes indicated that though Echols was limited in reaching in all directions with his left arm due to pain, he was unlimited in handling, fingering and feeling.

On May 20, 2002, Echols sought treatment with VA rheumatology resident Guarav Chaturvedi, M.D., who noted that Echols had "chronic elbow pain for which he needs legal forms filled out." He stated that Echols could not do work involving lifting heavy objects, squatting, extended periods of walking, or lifting his arms overhead.

On several occasions between September 2002 and October 2003, Echols was

5

seen by various doctors who noted that his hypertension was poorly controlled. He was also treated for an upper respiratory infection and advised to stop taking Motrin.

On January 5, 2004,[1] VA rheumatologist Dr. William Swedler stated that Echols had post-traumatic degenerative arthritis affecting his right hop, left elbow, left shoulder, and both fee, limiting his activities. Dr. Swedler found that Echols was "disabled from work that requires standing, walking, climbing, lifting, carrying, squatting, pushing, pulling, forceful gripping, or raising arms over his head." He also stated that "[t]his disability is permanent and total." Throughout the course of that year, Echols visited several other doctors to obtain refills for his blood pressure medication. The doctors noted on several of these visits that Echols' elbow and hip pain were controlled but that he still reported problems with his feet. On a visit to the VA on November 18, 2004, Echols again complained of trouble walking due to corns and calluses. The corns and calluses were again debrided.

On July 12, 2005, Echols was examined by Dr. Javier Reto at University of Illinois Chicago Medical Center. Echols reported that his elbow pain had increased over the previous two years. Dr. Reto took x-rays and reviewed them with attending physician, Dr. Chmell. The doctors observed that the k-wires that had been implanted to repair Echols' elbow were slightly backed out. Both doctors agreed that Echols might benefit from removal of the hardware. On October 27, 2005, Dr. Chmell tentatively scheduled Echols for removal of the hardware on November 16, 2005. Also during this time frame, Echols was issued a cane to assist in walking.

---

[1] It is not entirely clear whether Dr. Swedler saw Echols on January 5, 2004 or January 5, 2005. *See* R. 694.

The VA has awarded Echols a non-service connected disability pension based on a finding that he was permanently and totally disabled as of July 1, 2002. The date of this determination is not disclosed in the record, but it was on some date prior to the hearing before the ALJ. *See* R. 678.

## Determining Disability

To establish disability, a claimant must show that he is unable to engage in any substantial gainful activity due to the existence of a "medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The claimant must be unable to do not only his previous work, but also any other form of substantial gainful activity, considering his age, education and work experience. *Id.* The Social Security Act prescribes a five-step analysis for determining whether a claimant can engage in substantial gainful activity: (1) whether the claimant is presently employed; (2) whether the claimant's impairment or combination of impairments is severe; (3) whether the claimant's impairments meet or equal any impairments listed within the Code of Federal Regulations which the Commissioner of Social Security acknowledges to be conclusively disabling; (4) whether the claimant's impairments are such that they limit his remaining or residual functional capacity to the degree that he is no longer able to perform the duties and demands of a former occupation; and (5) whether the claimant is unable to perform any other work in the national economy, considering his age, education, and work experience. *Butera v. Apfel*, 173 F.3d 1049, 1054 (7th Cir. 1999). The claimant bears the burden of proof as

7

to steps one through four. *Id.*

## The ALJ's Decision

Echols first applied for DIB in June 1995 and was denied at the initial application stage with no further appeals. Echols reapplied for DIB and SSI in late September 1999, alleging that he had a disability beginning May 1, 1999. His applications were denied initially and upon reconsideration. Echols filed a request for a hearing, which was held on November 16, 2000 before an Administrative Law Judge (ALJ). At the hearing, Echols testified, as did medical expert Dr. William Newman and vocational expert Meyer Klein. The record at the hearing was held open so that additional medical records could be obtained. A supplemental hearing was held on November 18, 2001 after a consultative orthopedic exam by Dr. Elmes was completed at the ALJ's request.

The ALJ heard testimony from Dr. Newman, who reviewed the evidence, including the results of the consultative exam performed by Dr. Elmes. Dr. Newman subsequently opined Echols could lift, carry, push and pull up to twenty pounds occasionally and ten pounds frequently, using both hands. He also stated that he believed that Echols could stand and walk for up to four hours in a work day, and for unlimited periods of sixty to ninety minutes. He further opined that Echols could sit for unlimited periods of time, but that he should not perform any work that required the use of foot controls. He suggested that Echols not climb ropes but could occasionally climb ladders. He found that Echols could perform some overhead reaching but that he could not lift anything overhead. Dr. Newman stated that Echols had no limitations on dexterity or grip but was unable to fully extend his left arm due to the elbow injury. Dr. Newman specifically disagreed with Dr. Horvath's RFC assessment of Echols. He also

8

testified, at a supplemental hearing, that he disagreed with certain aspects of Dr. Elmes' RFC assessment, stating that he believed Echols had a somewhat greater ability to stand and walk than Dr. Elmes had found but did not believe that Echols should perform lifting as heavy as Dr. Elmes had indicated.

Vocational expert Klein was unable to attend the supplemental hearing, and thus expert Thomas Dunleavy appeared in his stead. Based on the testimony of Dr. Newman, Dunleavy opined that a hypothetical person in Echols' situation could not perform any of his previous work. Dunleavy further opined, however, that this hypothetical person could engage in substantial gainful activity and perform unskilled sedentary work in a significant number of jobs.

The ALJ found that Echols was not disabled. Echols then filed a request for review with the Appeals Council. His claim was initially rejected on appeal, but the case was subsequently reopened and was remanded to the ALJ.

The remand hearing was held before the ALJ on November 15, 2005. The ALJ reviewed Echols' medical records and heard testimony from vocational expert Lee Knutson. Knutson testified that a hypothetical person in Echols' situation could perform unskilled sedentary work; he identified several positions that such a person could perform.

The ALJ issued a partially favorable decision finding Echols disabled as of July 15, 2005, the day he turned fifty years old. As of that date, Echols was considered to be an "individual closely approaching advanced age" according to the SSA's medical-vocational guidelines. Because Echols' "date last insured" for purposes of DIB was December 31, 2002, the ALJ denied his claim for DIB, instead awarding him only

9

SSI benefits.

Echols contends that the ALJ erred in declining to find him disabled as of 1999, and he asks the Court to reverse or remand the ALJ's decision.

## Discussion

The Court reviews the ALJ's decision to determine whether it is supported by substantial evidence. 42 U.S.C. § 405(g). "Evidence is considered substantial if a reasonable person would accept it as adequate to support a conclusion." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). "To determine if substantial evidence exists, the court reviews the record as a whole but is not allowed to substitute its judgment for the ALJ's 'by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility.'" *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (quoting *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000)). "[I]f the findings of the Commissioner of Social Security are supported by substantial evidence, they are conclusive." *Id.* However, the ALJ must "build a logical bridge from the evidence to her conclusion" and "must confront the evidence that does not support [her] conclusion and explain why it was rejected." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002); *Idoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).

### 1. The ALJ's treating physician analysis

Echols first argues that the ALJ failed to properly weigh the medical evidence by not giving Dr. Horvath's opinion controlling weight as Echols' treating physician. "In determining whether a physician's opinion is entitled to controlling weight, the Social Security Administration regulations look to the '[l]ength of the treatment relationship and

the frequency of the examination,' and the '[n]ature and extent of the treatment relationship.'" *Doyal v. Barnhart*, 331 F.3d 758, 763 (10th Cir. 2003) (quoting 20 C.F.R. § 416.927(d)(2)(i), (ii)) [find a CA7 case]. The treating physician rule "directs the administrative law judge to give controlling weight to the medical opinion of a treating physician if it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence.'" *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006) (quoting 20 C.F.R. § 404.1527(d)(2)). The rule "is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once or who has only seen the claimant's medical records." *Id.* (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)).

The Supreme Court has observed, however, that "the assumption that the opinions of a treating physician warrant greater credit than the opinions of [other experts] may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (cited in *Hofslien*, 439 F.3d at 577). Additionally, a claimant "is not entitled to disability benefits simply because a physician finds that the claimant is 'disabled' or 'unable to work,'" as the "Commissioner is charged with determining the ultimate issue of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (citing 20 C.F.R. § 404.1527(e)).

Echols has been examined by numerous medical professionals, yet they all differ

11

as to the extent of his disability. Echols asserts that Dr. Horvath served as his treating physician and that as a result, the ALJ erred in rejecting her opinion. But Dr. Horvath saw Echols only twice prior to her RFC assessment: the first time when he was admitted to the hospital in April 2000 for a bleeding ulcer and the second time in August 2000 when Dr. Horvath examined Echols and completed the RFC. The ALJ stated that she "[could not] give controlling weight to the RFC opinion[ ] of Dr. Horvath," in part because Dr. Horvath only saw Echols twice prior to her RFC assessment.

Although Echols correctly states that "the ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record," *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003), the Seventh Circuit has recently ruled that "once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight." *Hofslien*, 439 F.3d at 376. "When treating and consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as substantial evidence supports that decision." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001).

In this case, the ALJ was presented with conflicting opinions from Drs. Horvath, Elmes and Newman. The ALJ determined that because Dr. Horvath had not ordered x-rays prior to the hearing, is not an orthopedic specialist, and did not report clinical findings that would support her RFC assessment, her opinion was unpersuasive. The ALJ found the opinions of Drs. Elmes and Newman, two orthopedic specialists, to be more reliable and gave those opinions "great weight." It is noteworthy in this regard that Dr. Elmes actually examined Echols and did not merely review his records. The ALJ considered the fact that Dr. Elmes had conducted a thorough examination of Echols,

including ordering x-rays to properly assess his medical condition. The ALJ also relied on Dr. Newman's testimony that Dr. Horvath's progress notes and clinical findings did not seem to support the functional limitations that she reported. The Court concludes that because well-supported contradicting evidence was introduced via Drs. Elmes and Newman, the ALJ was not required to give Dr. Horvath's opinion controlling weight.

Echols also argues that the ALJ did not adequately explain why she adopted certain RFC findings that she made. As noted earlier, the ALJ stated that she gave "great weight to the opinions of the two orthopedic specialists." R. 47. She also stated that she "in general, for each area of function, . . . adopt[ed] whichever of the two opinions suggests the greater limitation." *Id.* But this was not true in every instance. Echols argues that because the ALJ "relegate[d] Plaintiff to sitting for sixty to ninety minutes . . . without explanation . . . in excess of Dr. Elmes limitation on sitting and standing to relieve pain," she "failed to build an accurate and logical bridge between the evidence and [her] conclusion." Pl. Reply at 5.[2] The Court agrees with Echols; the ALJ did not explain this aspect of her RFC determination.

To "build a logical bridge," an ALJ must articulate her assessment of the evidence to demonstrate that she considered the important evidence. *Jones v. Barnhart*, 539 F. Supp. 2d 1057, 1064-65 (N.D. Ill. 2008) (citing *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993)). Additionally, the ALJ must explain why she rejected evidence that did not support her conclusion. *Idoranto*, 374 F.3d at 474. The ALJ's

---

[2] As the ALJ noted, Dr. Elmes opined that Echols could "stand and walk for a total of at least two hours in a work day, and that [he] can sit for unlimited periods, but must be allowed to alternate sitting and standing at unspecified intervals." R. 45.

decision must allow a reviewing court to "trace the path of [her] reasoning." *Jones*, 539 F. Supp. 2d at 1065 (quoting *Carlson*, 999 F.2d at 181). The decision must "assess the validity of [her] findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589,595 (7th Cir. 2002). "In other words, as with any well-reasoned decision, the ALJ must rest its [sic] denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

In this case, though the ALJ's decision was admirably detailed, she did not fully articulate how she derived all of Echols' functional limitations. Accordingly, the Court cannot conclude that she built a logical bridge to her conclusion in determining Echols' RFC. The case must be remanded for further proceedings on this basis alone.

**2.     The ALJ's credibility determination**

Echols contends that the determination the ALJ made regarding his credibility was in error because she relied on his failure to pursue regular treatment, failure to take strong pain medicine, and inconsistent statements regarding his drinking. Credibility determinations are typically left up to the ALJ because she is in the best position to observe the claimant. *See, e.g., Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The ALJ's credibility determinations are upheld unless "patently wrong." *Id.*

Echols argues that the ALJ's credibility determination was unsupported. The Court disagrees; the ALJ explained her determination regarding Echols' credibility thoroughly, basing it on the totality of the record. The ALJ did not merely consider Echols' failure to pursue regular treatment and inconsistent statements regarding his

14

drug and alcohol use; she also relied on statements by Drs. Horvath and Duvall that Echols was "inconsistent" or "non-specific" with regard to his symptoms. R. 50. She also based her determination on Echols' non-reporting of significant symptoms that he claimed in his testimony. In particular, the ALJ stated that VA records "do not show that [Echols] reported to his doctors that he falls frequently to the ground after a continuous period standing fifteen to thirty minutes, or that he has an impairment which would cause such an event." *Id.* The ALJ stated that "[it] is hard to imagine that a patient would not report such events to his treating doctors." *Id.*

In sum, because the ALJ asserted a reasoned basis for her determination regarding Echols' credibility, the Court cannot say that her determination was "patently wrong."

### 3. The ALJ's step five finding

Echols argues that the ALJ failed to ask the vocational expert whether his testimony was consistent with the Dictionary of Occupational Titles. The Commissioner argues that this was harmless error. The Court disagrees.

The Seventh Circuit has held that an ALJ has an "affirmative duty" to comply with Social Security Ruling (SSR) 00-4p, which "requires an ALJ who takes testimony from a [vocational expert] about the requirements of a particular job to determine whether that testimony is consistent with the Dictionary of Occupational Titles." *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006). Specifically, SSR 00-4p requires that

> [w]hen a [vocational expert] or [vocational specialist] provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that [vocational expert] or [vocational specialist] evidence and information

provided in the DOT. In these situations, the adjudicator will:

> Ask the [vocational expert] or [vocational specialist] if the evidence he or she has provided conflicts with information provided in the DOT; and if the [vocational expert's] or [vocational specialist's] evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

Additionally, "before an ALJ may rely on expert vocational evidence as substantial evidence . . . [she] must ask the expert how his . . . testimony as to the exertional requirement of identified jobs corresponds with the DOT and elicit a response for any discrepanc[ies]." *Prochaska*, 454 F.3d at 735 (citing *Haddock v. Apfel*, 196 F.3d 1084, 1087 (10th Cir. 1999)). SSR 00-4p places the burden of making the inquiry on the ALJ, not the claimant. *Id.*

The Commissioner concedes that the ALJ failed to comply with SSR 00-4p but contends the error was harmless "because the [vocational expert's] description[s] of the jobs of surveillance system monitor and information clerk are not inconsistent with the DOT." Def. Mem. at 29. Echols contends that some of the jobs the vocational expert listed are semi-skilled and therefore beyond his capability. The Commissioner states that one information clerk job described in the DOT is unskilled, but Echols counters that it is unclear that the particular information clerk job is what expert Knutson was describing. The Court agrees with Echols; the Commissioner's argument is speculative given the state of the record. Because there are several information clerk jobs listed in the DOT, many of which have requirements beyond Echols' capabilities, the ALJ should have been more specific in her questioning to determine the number of jobs in the economy of the particular information clerk job that matched her RFC findings.

Echols also asserts that since the September 11, 2001 terrorist attacks, the job

16

of surveillance system monitor is no longer performed at the "unskilled" level and that the DOT has yet to be updated to reflect this change. The Commissioner contends that because this information is based on a vocational expert's statement that is not contained in the record, it was not before the ALJ. The Court disagrees. Echols contended in his counsel's written submission to the ALJ that the DOT listing regarding surveillance monitors was out of date and that the position could no longer be considered unskilled. *See* R. 697-98. The Seventh Circuit has stated that "[i]f the basis of the vocational expert's conclusions is questioned at the hearing . . ., then the ALJ should make an inquiry to find out whether the purported expert's conclusions are reliable. Social Security Ruling 00-4p… requires the ALJ to '[e]xplain [in the] determination or decision how any conflict [with the Dictionary] that has been identified was resolved.'" *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). Although the court made that statement in *Donahue* with regard to conflicts between the vocational expert's statements and the DOT, it is not a stretch to include a vocational expert's reliance on out-of-date DOT information as a basis for the ALJ to inquire about its reliability. The court also noted in *Donahue* notes that "the [DOT] itself proclaims [that] when observing [it] users should rely on better data if they have any in their own possession." *Id.* at 445. Here, although Echols cited what, in fact, may be better data, the ALJ did not take steps to determine whether his contention was accurate. This, too, requires a remand for supplementation of the record and clarification (or modification) of the ALJ's ruling.

17

## 4. Effect of the VA's disability finding

Echols contends that the ALJ should have assigned some weight to the fact that he was found to be disabled and eligible for benefits by the VA. "However, the ALJ is not bound by findings made by either a governmental or nongovernmental agency concerning whether the claimant is disabled." *Clifford*, 227 F.3d at 874 (citing 20 C.F.R. § 416.904). She may, but is not required to, give weight to other agencies' determinations. *Id.* The bottom line is that "[t]he ALJ must independently determine if a claimant is 'disabled' as defined solely in the Social Security Act." *Id.* For this reason, the ALJ's failure to give weight to the VA's disability determination was properly within her discretion.

## Conclusion

For the reasons stated above, the Court grants plaintiff's summary judgment motion in part and denies defendant's motion for summary judgment [docket nos. 20, 29]. The case is remanded to the Social Security Administration for further proceedings consistent with this decision.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: October 20, 2008